**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**JUN 6 2003**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

JIMMIE RAY SLAUGHTER,

      Petitioner-Appellant,

v.

MIKE MULLIN, [*] Warden,
Oklahoma State Penitentiary,

      Respondent-Appellee.

No. 01-6185
(D.C. No. CIV-99-76-L)
(W.D. Okla.)

**ORDER AND JUDGMENT** [**]

Before **KELLY** , **HENRY** , and **MURPHY** , Circuit Judges.

Petitioner-appellant Jimmie Ray Slaughter, a state prisoner, appeals the

district court's decision denying him habeas relief from his two Oklahoma

first-degree malice murder convictions and death sentences. A jury convicted

Slaughter of shooting, stabbing and mutilating his former girlfriend, Melody

---

[*]     Mike Mullin replaced Gary Gibson as Warden of the Oklahoma State
Penitentiary effective March 25, 2002.

[**]     This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

Wuertz (Wuertz), and shooting to death their eleven-month old-daughter, Jessica.[1]

On appeal, Slaughter contends both that his trial attorneys' first-phase

representation was constitutionally deficient because counsel did not try to

implicate a different, alternate suspect and that there was insufficient evidence to

support the jury's second-phase finding that his killing Wuertz was especially

heinous, atrocious or cruel. This court affirms the denial of habeas relief under

28 U.S.C. § 2254.


## I.    FACTS

On July 2, 1991, Melody and Jessica Wuertz were each shot twice and

killed. The killer also stabbed Wuertz and mutilated her body. Suspicion

immediately centered on Slaughter, Jessica's father, who was at that time

embroiled in a contentious paternity and child-support dispute with Wuertz.

Slaughter worked as a nurse at the Veterans' Administration (VA) Hospital

in Oklahoma City. In approximately July 1989, Slaughter, who was married,

began an extramarital affair with Wuertz, who also worked at the VA hospital.

Slaughter, however, apparently never told Wuertz he was married. In July 1990,

Wuertz gave birth to Jessica. Soon thereafter, Slaughter, who was an Army

---

[1]    The jury also convicted Slaughter on five counts of perjury, based on testimony he gave before the grand jury investigating these deaths. Slaughter does not challenge these perjury convictions in this proceeding.

-2-

reservist, volunteered for active duty during the Gulf War. He was stationed at Fort Riley, Kansas, about a four-and-a-half-hour drive from Wuertz's home in Edmond, Oklahoma. Before leaving for active duty, Slaughter remarked to a co-worker that "he was actually glad to be leaving . . . and that he was especially glad to get away from Melody because she was getting pushy, and if she kept pushing [him], [he'd] have to kill her." Trial tr., July 19, 1994, at 81. Slaughter further asserted that he could kill Wuertz without getting caught; "they would know who did it but they would never be able to prove it," *id.*, July 21, 1994, at 122.

In late October 1990, Wuertz discovered Slaughter was married. In fact, she called Slaughter's wife to tell her about Slaughter's infidelity. Slaughter was furious with Wuertz for this, but managed to explain to his wife that this must have been a prank call, probably made by one of his former wives. Slaughter later told a co-worker in Kansas that "his wife did not know about" Jessica and "he would do anything to keep [her] from finding out." *Id.*, Sept. 12, 1994, at 87.

Although Wuertz had previously considered filing a paternity suit against Slaughter, she had not yet done so because she feared that this would drive him away and they would never marry, as she had hoped. Aware now that Slaughter was already married to someone else, Wuertz sought the Oklahoma Department of Human Services' (DHS) help in collecting child support from him. Slaughter,

however, had previously told Wuertz that if she ever pursued such a child-support proceeding, he would kill both Wuertz and the baby. Numerous witnesses testified to Slaughter's rage stemming from Wuertz's commencing those proceedings. On at least one occasion, Slaughter told his then girlfriend in Kansas that he wished Wuertz were dead.

While still in Kansas, Slaughter was able to keep tabs on Wuertz's progress with the paternity proceedings through another of his paramours, Cecilia Johnson. Johnson was also a nurse at the Oklahoma City VA hospital, and Wuertz's apparent friend.

Although having signed an affidavit soon after Jessica's birth admitting he was the child's father, Slaughter, in response to the paternity proceedings, denied paternity and submitted to blood tests. Those test results established that there was a 99.39% likelihood Slaughter was Jessica's father. Wuertz received those test results on June 19, 1990. Although DHS mailed those results to Slaughter at Fort Riley, via certified mail, and attempted to have the results served on Slaughter through the fort's Provost Marshal's office, Slaughter never officially received those test results. Nevertheless, Wuertz did share the test results with her co-workers. Slaughter testified that Cecilia Johnson, having heard the test results from Wuertz, probably did inform him of those results. Slaughter's grand

-4-

jury testimony, Jan. 3, 1992, at 36 (played at trial, *see* Trial tr., Aug. 29, 1994, at 6).

Slaughter called Wuertz during the early morning hours of Sunday, June 30, 1991, telling her there was no way that the baby was his, nor was there any way he was going to pay Wuertz anything. Minutes later, Johnson called Slaughter and they talked for over three and one-half hours. Wuertz was afraid to go home that night because she feared Slaughter would be there.

The State theorized that Slaughter wanted to kill Wuertz and Jessica while he was still stationed in Kansas, so he could use that as an alibi. If so, he would soon run out of time to do so. Slaughter would be discharged from active duty within a week, and Wuertz and Jessica were to fly to her parents' home on July 3 for a two-week visit.

Wuertz and her daughter were killed July 2, 1991. The two medical examiners performing autopsies on the victims estimated they died somewhere between 10:00 a.m. and 2:00 p.m., and most likely around noon that day. Several of Wuertz's neighbors reported hearing what may have been gunshots sometime between 11:30 a.m. and 12:45 p.m. Additionally, neighbors living in the house right next door to Wuertz testified that, at around noon, their dog "went into chaos" and "went ballistic and [was] barking tremendously and was very scared." Trial tr., Aug. 2, 1994, at 118, 120. This was just before the neighbors heard

what may have been a gunshot.  The State theorized that the killer had hopped the fence to Wuertz's backyard, startling the neighbors' dog.

Wuertz's neighbors testified at trial that they had not seen any vehicles other than Wuertz's car at her home that morning.  At 12:37 p.m., however, several young teenage boys walking down a street near the victims' home noticed a man fairly matching Slaughter's description, in a car parked away from the other houses, next to an open field.  The boy walking closest to that car positively identified Slaughter as the man he saw, both in a photo lineup conducted soon after the murders and at Slaughter's trial, three years later.  Further, a second boy also positively identified Slaughter at trial as the man he saw in the car.

Additionally, these two boys described the car they had seen as a bluish-gray, four-door vehicle which also generally matched Slaughter's car's description.  And, although the second boy specifically identified the car he had seen as a Nissan, and Slaughter's car was, instead, a Dodge, both boys did pick Slaughter's car out of a photo lineup soon after the murders.

Donald Stoltz, who had spent time with Slaughter in jail, corroborated the boys' identification, testifying Slaughter had told him that the kids who saw him, the day the murders occurred, mistakenly identified his car as a Japanese-made vehicle.  According to Stoltz, Slaughter said he did not know why he had left his

car window down; and that, if he had kept his tinted window raised, no one would have ever seen him.

The State's experts testified that the killer most likely entered Wuertz's home, using a key, and killed the victims in a "blitz-style attack." There was no sign of forced entry, yet Wuertz was very security conscious and always kept her house locked, even when she was inside. The confrontation between Wuertz and the killer appeared to have occurred solely in the hallway, rather than near the front door. Although Slaughter denied having a key to Wuertz's house, investigators found those keys in Slaughter's car the day after the murders.

Both victims had been shot twice with Eley brand .22 caliber long-rifle, subsonic, hollow-point bullets that had not been copper washed. This imported ammunition was quite rare, representing only one tenth of one percent of the total .22 caliber ammunition sold in the United States during 1990 and 1991. It could generally not be purchased in American gun shops, but instead had to be special ordered. Police found this same rare ammunition in Slaughter's gun safe in his Oklahoma home. Metallurgical tests indicated that the Eley ammunition in Slaughter's safe was elementally identical to the bullets that had killed the victims. According to the State's expert, this indicated that Slaughter's ammunition had been manufactured from the same piece of lead that produced the bullets that had killed the victims. Based on this information, the State argued the

bullets that killed the victims had to come from the very same box of Eley ammunition found in Slaughter's gun safe.

Police could not use the bullets that had killed the victims to identify the murder weapon because those bullets were so badly damaged. According to the State's ballistics expert, this is a common phenomenon with .22 caliber ammunition. Slaughter, who collected guns, did own several .22 caliber weapons.

In addition to shooting each victim twice, the killer stabbed Wuertz once in the heart; deeply slashed both her breasts multiple times; scratched and cut her abdomen, including apparently inscribing a variation on the letter R; and inflicted a deep, nine-inch cut running from her vagina through her anal canal and lower back. The medical examiner testified that the killer had used a single-edged knife, at least six inches long and one-inch wide. Slaughter had a large collection of knives.

Although the killer planted evidence and arranged the crime scene to look like a sexual assault, police could find no physical evidence that a sexual assault had occurred. Nor did robbery appear to be a motive for the killings, as police found cash in plain sight near the bodies, and Wuertz's purse, with $140, had been left untouched. An FBI behavioral scientist testified that the manner in which the killer had carried out these murders suggested, instead, a domestic violence crime, carried out in a very controlled manner.

Evidence that the killer left at the crime scene included a comb, on which Negroid hairs had been bunched, and a pair of men's underwear. The comb was a type that was not generally available but sold for institutional use in such places as the Oklahoma City VA hospital and Fort Riley. Another Negroid hair was found on Wuertz's body. Cecilia Johnson admitted having collected these hairs, as well as the underwear, from a transient black man who had been a patient at the VA hospital the month before the murders. Johnson told a co-worker that she had collected these items at Slaughter's request and mailed them to him in Kansas. According to Johnson's co-worker, Slaughter "felt that he could confuse them at the scene" with these items. Trial tr., Aug. 16, 1994, at 74. There was evidence corroborating that Johnson had, in fact, mailed Slaughter a small package in early June 1991. After the murders, Slaughter, who disliked African-Americans, suggested to police and his co-workers that perhaps a black man or a black transient had killed the victims. At different times, Slaughter also suggested to police both that there had been a black man seen jumping fences in Wuertz's neighborhood and that Wuertz preferred to date African-American men. There was, however, no evidence to support either contention. Cecilia Johnson later suggested to a black co-worker, J.C. Sanders, that the planted evidence was actually meant to implicate Sanders in the murders.

On Wuertz's body, police also found a heavily-treated head hair, microscopically consistent with one of Slaughter's black co-workers at Ft. Riley. This co-worker, however, had never been to Oklahoma.

Finally, two inmates, Dennis Hull and Lloyd Hunter, both testified that, while they were in jail with Slaughter, he confessed to them that he had killed the victims.

At trial, Slaughter propounded an alibi defense through his former wife, Nicki Bonner. Bonner, who was married to Slaughter at the time the murders occurred, testified that Slaughter had been in Kansas all day July 2, spending time with her and their two daughters, who were visiting him for the Fourth-of-July holiday. According to Bonner, on that day, Slaughter slept until 10:00 or 10:30 a.m. The family then ate lunch at the Country Kitchen restaurant, arriving between 12:30 and 1:00 p.m. The waitress there did recognize Bonner and her two daughters, and further testified that there was a man with them that day who looked similar to Slaughter. The waitress, however, never got a good enough look at the man's face to identify him. According to jailhouse informant Stoltz, Slaughter told him that maybe the waitress could not identify him because he was not at the restaurant that day. Rather, "it could have been a friend" eating with his family. *Id.* Aug. 4, 1994, at 79.

According to Bonner, the family drove around a nearby lake after lunch and then travelled an hour to Topeka to shop. A Walmart store clerk in Topeka remembered Slaughter buying his daughter a watch one afternoon, but could not pinpoint the exact date this had occurred. The sales clerk did remember that Slaughter had paid with a fifty dollar bill. Although Slaughter did not have the receipt for this purchase, the store's register tapes indicated that there was a sale of that particular type of watch at 3:26 p.m. on July 2, and that the customer had paid with a fifty-dollar bill. The defense argued that this must have been Slaughter's purchase.

The family also bought several other items at Walmart. The separate receipt for those items indicated that this second purchase occurred at 4:16 p.m. on July 2. The cashier who conducted this sale recognized Bonner and her older daughter, and she remembered there was a younger girl, too. The clerk, however, did not remember seeing a man with them that afternoon.

Several other Kansas merchants, located in a mall near the Walmart, did remember seeing Slaughter later that afternoon, beginning just after 5:00 p.m. This, however, does not lend any further support to Slaughter's alibi. According to the parties' stipulation as to the mileage between the victims' home and this mall, if Slaughter had left Edmond soon after 12:30 p.m., he would have been able to drive from Edmond to the mall by 5:00 p.m.

-11-

At trial, Slaughter's attorneys supplemented his alibi defense by also arguing that it might have been Cecilia Johnson, acting on her own, who killed Wuertz and her baby. The trial court, nevertheless, instructed jurors that they could convict Slaughter of first-degree murder if they found that he had actually killed the victims or, alternatively, if they found, instead, that he had aided and abetted Cecilia Johnson in doing so. Jurors, then, convicted Slaughter of two counts of first-degree, malice-aforethought murder.

## II. ISSUES

**A. Ineffective representation during guilt stage.** Slaughter now contends that his trial attorneys were constitutionally ineffective for arguing that Cecilia Johnson, rather than Slaughter, killed the victims; and that defense counsel should have argued, instead, that another of Wuertz's boyfriends, Rick Gullotto, killed the victims.

**1. Exhaustion/procedural default.** The State first argues that these claims remain unexhausted because Slaughter never raised them in state court. *See* 28 U.S.C. § 2254(b)(1)(A). In order to exhaust his state-court remedies, Slaughter must have fairly presented the substance of these habeas claims to the state court before he raised them in this federal habeas proceeding. *See Duncan*

*v. Henry*, 513 U.S. 364, 365-66 (1995) (per curiam) (pre-AEDPA); *see also, e.g.,*

*O'Sullivan v. Boerckel*, 526 U.S. 838, 844-45 (1999) (pre-AEDPA).

Slaughter devoted at least forty pages of his state post-conviction

application to detailing the evidence implicating Gullotto in the murders.

Although in that state-court pleading Slaughter primarily argued that these facts

implicating Gullotto were either newly discovered or the State had wrongfully

withheld them from the defense, Slaughter did also assert that his trial attorneys

were ineffective "[t]o the extent these issues could have been identified at trial or

developed in direct appeal." State post-conviction application at 78.

Additionally, Slaughter alleged that

> [t]rial counsel was ineffective. Trial counsel's errors were
> numerous. Trial counsel failed to meaningfully and adequately
> investigate, develop and present all facts, matters and issues relevant
> to the constitutionality of [Slaughter's] conviction and death
> sentence. These errors included by way of example, but not
> limitation, the development and investigation of an alternative
> suspect, Rick Gullotto; the development and investigation of
> evidence challenging the prosecution's theory on the victims' time of
> death[, which supported the claim that Gullotto was the actual killer];
> and the development and investigation of information known by
> Edmond Police Detective, Dennis Dill[, who championed the theory
> that it was Gullotto, and not Slaughter, who had killed the victims].

*Id.*, addendum A at 19-20. These state-court allegations were sufficient to fairly

present the substance of Slaughter's current federal habeas claims to the state

court. *See Engberg v. Wyoming*, 265 F.3d 1109, 1114, 1115-16 (10th Cir. 2001)

(holding habeas petitioner had exhausted his claim that prosecutor presented false

-13-

argument regarding witness's composure during robbery, when petitioner had presented "essential substance" of this issue in state court claim challenging State's failure to reveal its attempt to hypnotize State witness), *cert. denied*, 535 U.S. 1001 (2002). Slaughter, therefore, has exhausted his state-court remedies. *See* 28 U.S.C. § 2254(b)(1)(A).

Slaughter did not raise these particular ineffective-trial-counsel claims on direct appeal, but instead asserted them for the first time in his initial state post-conviction application. The state appellate court, therefore, deemed Slaughter to have procedurally defaulted these claims, determining that "the facts upon which his claims of ineffective assistance of trial counsel are based were contained in the [trial] record or could have been available to direct appeal counsel such that the arguments could have been raised in the direct appeal." *Slaughter v. State*, 969 P.2d 990, 995 (Okla. Crim. App. 1998). Nonetheless, two of Slaughter's three trial attorneys had also represented him on direct appeal. *See id.* at 994 n.2. As a consequence, this state procedural bar is inadequate to preclude federal habeas review. *See English v. Cody*, 146 F.3d 1257, 1263, 1264 (10th Cir. 1998); *see also, e.g., Neill v. Gibson*, 278 F.3d 1044, 1054, 1058 (10th Cir. 2001), *cert. denied*, 123 S. Ct. 145 (2002). Because the state appellate court did not address the merits of this claim, however, we review the district

-14-

court's decision denying Slaughter habeas relief *de novo*. *See, e.g., Romano v. Gibson*, 278 F.3d 1145, 1150 (10th Cir. 2002).

      *2. Merits.* To obtain habeas relief on this claim, Slaughter must establish both that his trial attorneys' representation was deficient and that their deficient performance prejudiced his defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Because we conclude that Slaughter's attorneys' performance was not deficient, however, we need not address *Strickland*'s prejudice inquiry. *See id.* at 697.

      "[T]he overriding question under the [performance] prong of *Strickland* is whether, under all the circumstances, counsel performed in an objectively unreasonable manner." *Bullock v. Carver*, 297 F.3d 1036, 1046 (10th Cir.), *cert. denied*, 123 S. Ct. 703 (2002); *see also Strickland*, 466 U.S. at 688, 690. "[W]e always start th[at] analysis [by presuming] that an attorney acted in an objectively reasonable manner and that an attorney's challenged conduct *might* have been part of a sound trial strategy." *Bullock*, 297 F.3d at 1046; *see also Strickland*, 466 U.S. at 689. Additionally, this court reviews defense counsel's performance deferentially, "eliminat[ing] the distorting effects of hindsight, . . . reconstruct[ing] the circumstances of counsel's challenged conduct, and . . . evaluat[ing] the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "For counsel's performance to be constitutionally

ineffective, it must be completely unreasonable, not merely wrong, so that it bears no relationship to a possible defense strategy." *Le v. Mullin*, 311 F.3d 1002, 1025 (10th Cir. 2002) (further quotation omitted), *petition for cert. filed*, (U.S. May 9, 2003) (No. 02-10634). We conclude that was not the case here.

As an initial matter, it was objectively reasonable for defense counsel not to rely solely on Slaughter's alibi defense, which was far from airtight. It was therefore objectively reasonable and not inconsistent to suggest someone else murdered the victims. *See* Appellant's opening br. at 21 (acknowledging his alibi defense was weak; agreeing that counsel's asserting an alibi defense and arguing someone else killed the victims "falls well within the prevailing norms of professional conduct"). Furthermore, the circumstantial evidence of Slaughter's guilt was extensive and much of that was equally consistent with Johnson's guilt.

In that light, defense counsel suggested to jurors that the real killer may have been Cecilia Johnson, who died before trial. From a prosecution motion filed before the taking of any testimony defense counsel became aware that the State would counter by arguing that, even if Johnson did the actual killing, Slaughter was still guilty of aiding and abetting her in doing so. Slaughter now asserts, however, that this defense strategy implicating Johnson was objectively unreasonable because, by suggesting that Johnson was the actual killer, defense

counsel in essence conceded Slaughter's guilt under the State's aiding-and-abetting theory. We disagree.

Johnson had already been inextricably linked to the murders when she admitted to a co-worker that she had obtained the evidence found planted at the crime scene. She also knew where the victims lived and, as Wuertz's purported friend, she could have gained entrance into Wuertz's otherwise locked home. Johnson, too, may have possessed the weapons necessary to commit these crimes. Several co-workers testified that she carried a .22 caliber gun in her purse. A few months before the murders occurred, Slaughter had given Johnson a knife as a birthday gift. Johnson had no alibi and, soon after the murders, she removed a number of items from her home, fearing police would search her residence.

There was also evidence supporting defense counsel's theory that Johnson could have killed the victims without Slaughter's involvement. Johnson was emotionally unstable. Witnesses described her as struggling with low self esteem and she also had a significant history of depression. Years earlier, she had tried to kill herself. And, several months after these murders, she again tried to take her own life. Eventually she succeeded in killing herself, in February 1992, a month after a grand jury indicted Slaughter.

Johnson had also been diagnosed with a personality disorder which included avoidant, dependent, and self-defeating personality traits. According to

the State's psychological expert, such a disorder could produce intense fits of jealousy and result in her becoming obsessed with things. The evidence further suggested that Johnson became obsessed with Slaughter. She had begun a sexual relationship with him in the spring of 1990, while Wuertz was pregnant with Jessica. At the outset of their relationship, Johnson was jealous of Evelyn Cunningham, another VA employee with whom Slaughter was pursuing a romantic relationship at this same time. Further, according to her co-workers, as time went on Johnson began to espouse Slaughter's views. After Slaughter reported to Fort Riley in September 1990, he and Johnson spoke with each other several times a week, using the federal government's tele-communication system (FTS) available at their workplaces. Johnson's friend, Jennifer Underwood, testified that Johnson became very dependent upon her relationship with Slaughter, and Johnson grew to be more concerned about Slaughter than herself.

In the fall of 1990, Johnson became pregnant with Slaughter's child, but she soon miscarried. According to Underwood, this was devastating to Johnson. It was also around this same time that Johnson began telling Underwood and other nurses that she would like to have custody of Jessica. Her co-workers also testified that Johnson was jealous of Wuertz because of the child.

Johnson had initially befriended Wuertz. At one point, however, Johnson became upset after finding a romantic letter Slaughter had written Wuertz.

Further, after Wuertz filed the paternity action against Slaughter in the fall of 1990, Johnson started to avoid Wuertz and became more hostile toward her. Through Johnson's connection with Wuertz, however, Johnson remained privy to information concerning the paternity proceedings which she passed along to Slaughter. Johnson was aware that the paternity proceedings upset Slaughter. In fact, after Slaughter received a DHS notice concerning his support obligations, Slaughter told a girlfriend in Kansas that he was concerned because he had a friend in Oklahoma who wanted to do something to Wuertz. The State argued that Slaughter's friend was Johnson.

Before the murders, Johnson had told her co-worker, J.C. Sanders, that she would be willing to help Slaughter kill Wuertz and she would even do it for him if he asked. After the VA hospital staff heard about the murders, however, Johnson took Sanders aside and suggested to him that she had never made any such statement.

There was, then, substantial evidence supporting defense counsel's argument that Johnson, obsessed with Slaughter and jealous of Wuertz, acted on her own to kill the victims. Further, and contrary to Slaughter's assertions to this court, it was not the defense alone who produced this evidence tying Johnson to the murders. Rather, from the trial's outset, it was the State's theory that Johnson had assisted Slaughter in carrying out these murders. The State

presented much of the evidence implicating Johnson's involvement in the murders. Defense counsel just took this evidence and the State's theory a step further, arguing it was Johnson acting alone who actually killed the victims.

To be sure, there was also significant evidence presented at trial closely linking Johnson to Slaughter; suggesting that Johnson would never have harmed Jessica; that it was Slaughter, and not Johnson, who controlled their relationship; and that, when Johnson heard about the murders, she appeared genuinely shocked and upset. Nonetheless, in the face of the State's compelling case against Slaughter and the evidence inextricably linking Johnson to the murders, it was not objectively unreasonable for defense counsel to argue that it was Johnson, unbeknownst to Slaughter, who took it upon herself to kill the victims.

Slaughter now contends, however, that defense counsel had a much better alternate suspect that they should have instead implicated: Wuertz's friend, Rick Gullotto. Gullotto was also a nurse at the Oklahoma City VA hospital and an Army reservist; he disliked African-Americans; he collected guns and knives, and in particular owned several .22 caliber weapons; he liked to carve his initials into things; he talked about committing the perfect crime; and he had remarked to different people that he could murder anyone and make it look like they had died at another time. Gullotto also had a history of domestic violence.

Gullotto and Wuertz had dated a few times. Wuertz wrote Gullotto the day before the murders, breaking off their relationship. According to Gullotto, however, he found this note at work at approximately 7:00 a.m. on the day the murders occurred. Further, Gullotto testified before the grand jury that it was Wuertz who was more interested in a romantic relationship with him, rather than he with her. In fact, at this same time, Gullotto had also been pursuing a romantic relationship with another VA nurse and was also apparently living with a third woman. According to Gullotto, therefore, he was relieved rather than angered by Wuertz's note ending their relationship. Several other VA nurses corroborated Gullotto's version of his relationship with Wuertz.

Nevertheless, the day after the murders, Gullotto lied to police, falsely asserting both that he had spent the night preceding the murders with still another girlfriend, and also denying that he had had a sexual relationship with Wuertz. Gullotto apparently never explained, at least anywhere in the record, where he was during the early morning hours of July 2, 1991.

Certainly, then, there was evidence from which defense counsel could have also developed a defense strategy suggesting that Gullotto was the real killer. There were, however, several obstacles to such a defense. As an initial matter, "Oklahoma has an evidentiary rule that a criminal defendant cannot put on evidence that someone else might have committed the charged offense, absent

proof that person took an overt act toward the commission of the crime." *Romano v. Gibson*, 239 F.3d 1156, 1165-66 (10th Cir. 2001); *see also, e.g., Dennis v. State*, 879 P.2d 1227, 1232 (Okla. Crim. App. 1994); *Woodruff v. State*, 846 P.2d 1124, 1137 (Okla. Crim. App. 1993). "The main purpose of [this] rule . . . is to prevent juries from embarking on wild goose chases." *Romano*, 239 F.3d at 1168. Accordingly, the trial court granted the State's motion *in limine* precluding the defense from asserting any evidence implicating someone other than Slaughter or Johnson, without first establishing for the court a direct connection between that other person and the murders.

Slaughter now asserts that he could have met these trial-court requirements because he had sufficient evidence directly linking Gullotto to the murders. Wuertz's neighbor, John Harris, reported seeing a dark colored, small pickup truck in front of the Wuertz residence shortly before 6:00 a.m. the morning the murders occurred. Gullotto drove a red pickup truck that matched the description Harris gave police. Several other neighbors also told police they had observed such a truck parked at the Wuertz residence on several previous occasions, but not on the day of the murders. Still another neighbor, Larry Huthison, reported hearing gunshots at approximately 6:30 a.m., "[s]omewhere around the time of the homicides, but possibly several days before." Section 2254 pet., app. doc. 22 at 2. This was, however, contrary to numerous neighbors' reports that they heard

-22-

gunshots, instead, sometime between 11:30 a.m. and 12:45 p.m. the day the murders occurred.

It is not clear whether these two reports would have been sufficient under Oklahoma law to permit Slaughter to argue to the jury that Gullotto was the actual killer. *Cf. Tahdooahnippah v. State*, 610 P.2d 808, 810 (Okla. Crim. App. 1980) (noting "[i]t is insufficient to merely place" the alternate suspect "at the scene of the murder;" noting, also, that another's motive, alone, is insufficient); *Quinn v. State*, 25 P.2d 711, 714 (Okla. Crim. App. 1933) (indicating another person's motive and opportunity were insufficient, without evidence of overt act taken by alternate suspect to commit murder). Assuming the evidence was sufficient to indicate Gullotto took an overt act toward killing the victims, there were still additional problems with this defense theory. First, Gullotto had an apparently airtight alibi for midday Tuesday, July 2, 1991, when the State argued the murders occurred. He worked that day at the VA hospital, arriving at approximately 7:30 a.m. and working until 4:20 p.m. Several co-workers corroborated Gullotto's alibi. Therefore, in order for Slaughter to have argued effectively to the jury that it was Gullotto who actually killed the victims, Slaughter would have also had to challenge the State's theory that the murders occurred midday July 2. There was some evidence from which defense counsel could have challenged this midday time of death, although such a theory would still have been contrary to the

weight of the evidence. Nonetheless, an earlier time of death would have actually diminished, rather than strengthened, Slaughter's own alibi. If the murders had, instead, occurred during the early morning hours of July 2, Slaughter's midday alibi would not exclude him as the killer. For these reasons, therefore, we cannot say defense counsel was objectively unreasonable in deciding not to challenge the State's theory that the murders occurred around midday July 2.

Another problem defense counsel would have faced, had they decided to argue that Gullotto was the actual killer, was the necessity to connect Gullotto to Johnson, who had already inextricably been connected to the murders.[2] While Gullotto and Johnson did both work at the VA hospital, there is no evidence that

---

[2] Johnson indicated she had, at Slaughter's request, obtained the evidence found planted at the crime scene and mailed this evidence to him. In support of his current theory that Gullotto killed the victims, Slaughter now asserts that Johnson travelled to Ft. Riley to be with him the week after she mailed him the hair and underwear. Slaughter theorizes that, while she was there, Johnson must have retrieved these items from Slaughter's military quarters, taking them back to Oklahoma where she later gave them to Gullotto to plant at the crime scene. Slaughter further asserts that, while Johnson was at Ft. Riley, she must have also obtained a hair from Army nurse Mosely, again to give to Gullotto to plant at the crime scene.

In posing this theory, Slaughter now relies on Johnson's statements to police, made after she entered into an immunity agreement with the State. The trial court, however, held these statements were inadmissible at trial, apparently in part at the defense's request. Defense counsel, however, was not objectively unreasonable in preventing Johnson's statements from reaching the jury because, in those statements, Johnson also made numerous assertions that corroborated the State's evidence against Slaughter and that would otherwise have been extremely detrimental to Slaughter's defense.

Gullotto even knew Johnson, let alone plotted the murders. Slaughter does try to connect Gullotto with Johnson by pointing to a series of twenty-five telephone calls made from the VA hospital FTS line to Gullotto's home, beginning in February 1991, and ending the night following the murders. Slaughter now contends these calls must have been made by Johnson to Gullotto. There is simply no evidentiary basis for that assertion. The parties stipulated that "[t]here are several hundred telephones within the hospital complex from which a caller can engage the FTS system and it is impossible to determine from which telephone a call is being placed." Trial tr., July 18, 1994, at 183. Gullotto did work at the VA hospital during most of this time period, and he was also trying to establish romantic relationships with several hospital employees. These calls, therefore, could have been made by any number of people for many different reasons. They do not suggest a link between Johnson and Gullotto, a link which would have been necessary for defense counsel to argue to the jury that it was Gullotto, conspiring with Johnson, who actually killed the victims.[3]

Finally, had defense counsel chosen to present a defense premised on Gullotto's having killed the victims, aided by Johnson, this defense still remains

---

[3] Slaughter complains that the trial court permitted the State to argue at trial, based on similar evidence, that Johnson, using the FTS line, had made numerous calls to Slaughter while he was stationed in Kansas. But, at trial, the defense and the State stipulated to those calls. Additionally, the trial record contained other evidence supporting the fact that Johnson had used the FTS line to call Slaughter.

susceptible to the same counter arguments that the State, in any event, asserted at Slaughter's trial. In light of the direct connection between Johnson and the evidence found planted at the crime scene, as well as the significant evidence linking Johnson with Slaughter, the State could still have argued that Slaughter aided and abetted these murders by, perhaps, getting Johnson and Gullotto to kill the victims, or getting Johnson to hire Gullotto to kill the victims. There was, in fact, a significant amount of testimony at trial that Slaughter, in other contexts, had previously suggested hiring people to kill others for him. Even had the defense argued it was Gullotto who actually killed the victims, therefore, Slaughter would not necessarily have avoided the State's aiding-and-abetting theory.

In summary, then, there was certainly some evidence upon which defense counsel could have formulated a defense premised on Gullotto being the actual killer. And defense counsel could perhaps have gotten that evidence before the jury by satisfying Oklahoma law requiring proof of an overt act Gullotto had taken toward committing these crimes. Nonetheless, in light of the further obstacles defense counsel would have faced in asserting such a defense, we cannot conclude that it was objectively unreasonable for defense counsel to have chosen between these two plausible defenses and decided not to assert a defense blaming Gullotto, but, instead, to argue that Cecilia Johnson, acting on her own

-26-

and unbeknownst to Slaughter, had killed the victims. *See Bell v. Cone*, 535 U.S. 685, 702 (2002) (holding state court did not unreasonably apply *Strickland* where neither option available to defense counsel "so clearly outweigh[ed] the other"); *Duckett v. Mullin*, 306 F.3d 982, 996 (10th Cir. 2002) (noting this court must "apply a heavy measure of deference to trial counsel's strategic decision to raise" one plausible defense instead of another) (further quotation omitted), *cert. denied*, 123 S. Ct. 1911 (2003). "It is all too tempting for a defendant to second-guess counsel's assistance after conviction . . ., and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable." *Strickland*, 466 U.S. at 689. "There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way." *Id.*; *see also, e.g., Romano*, 278 F.3d at 1154. "In light of all the circumstances, [therefore,] we cannot say that defense counsel's strategic decision [here] was completely unreasonable." *Romano*, 278 F.3d at 1154 (further quotation omitted). Because Slaughter's defense attorneys' performance did not fall "below an objective standard of reasonableness," he is not entitled to federal habeas relief. *Strickland*, 466 U.S. at 688.

Slaughter further argues, however, that defense counsel, here, did not choose between plausible defense strategies because, although defense counsel,

prior to trial, had most of this evidence suggesting Gullotto might have actually killed the victims, defense counsel was simply unaware of this evidence, essentially losing it in the enormity of this case. Slaughter's speculation, however, flies in the face of the pretrial record.

Early in the case, police considered Gullotto a suspect. He testified before the grand jury, along with several of his co-workers, who were able to corroborate his alibi. Slaughter's attorneys had access to these grand jury transcripts prior to trial. The State had also listed Gullotto on numerous pretrial witness lists. Moreover, at Slaughter's preliminary hearing, the defense itself presented testimony concerning Gullotto's being a suspect. In light of Gullotto's prevalence throughout the pretrial proceedings, therefore, we cannot accept, without more, Slaughter's current contention that defense counsel were unaware they had evidence from which they could have asserted Gullotto was the actual killer. *See Duckett*, 306 F.3d at 995-96 (holding that, when defense counsel was aware of facts supporting a different defense, it was "clear that defense counsel's decision not to pursue other possible defenses was a tactical one"); *see also Bryan v. Gibson*, 276 F.3d 1163, 1176 (10th Cir. 2001), *reh'g en banc granted*. In light of this record, therefore, Slaughter has failed to "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Strickland*, 466 U.S. at 689 (further quotation omitted); *see also*

*Bullock*, 297 F.3d at 1047 (noting *Strickland* "places upon the defendant the burden of showing that counsel's action or inaction was not based on a valid strategic choice") (further quotation omitted).

**B.    *Ineffective appellate representation.*** Slaughter argues that his appellate counsel was ineffective for failing to raise the preceding ineffective-trial-counsel claim on direct appeal. The first relevant question posed by this claim is whether direct-appeal counsel's representation was objectively unreasonable. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Because Slaughter's ineffective-trial-counsel claim lacked merit, his direct-appeal counsel was not objectively unreasonable in failing to assert that claim on direct appeal. *See Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir. 2003).

**C.    *Was there sufficient evidence to support a determination that Melody Wuertz's death was especially heinous, atrocious or cruel?*** At the capital sentencing proceeding, the jury found that Wuertz's death was especially heinous, atrocious or cruel, and that Slaughter, in killing both victims, had created a great risk of death to more than one person. After balancing these aggravating factors with Slaughter's mitigating evidence, the jury imposed two death sentences.

Slaughter now contends there was insufficient evidence to support the jury's finding that he killed Wuertz in an especially heinous, atrocious or cruel

manner. "To establish th[is] aggravator under Oklahoma law, the [State] must prove the murder was preceded by torture or serious physical abuse. Torture includes the infliction of either great physical anguish or extreme mental cruelty, while physical abuse requires evidence of conscious physical suffering." *Hooker v. Mullin*, 293 F.3d 1232, 1240 (10th Cir. 2002) (further quotations omitted), *cert. denied*, 123 S. Ct. 975 (2003). The Oklahoma Court of Criminal Appeals determined that there was sufficient evidence to support this aggravating factor. *Slaughter v. State*, 950 P.2d 839, 859-60 (Okla. Crim. App. 1997).

Both Slaughter and the State assert that, applying *Jackson v. Virginia*, 443 U.S. 307 (1979), the relevant question here is whether, viewing the evidence in the light most favorable to the prosecution, any rational factfinder could have found this aggravating factor beyond a reasonable doubt. *See also, e.g., Lewis v. Jeffers*, 497 U.S. 764, 781 (1990) (applying *Jackson*). The state appellate court, however, in denying Slaughter relief on this claim, considered only "whether there was *any competent evidence* to support" this aggravator. *Slaughter*, 950 P.2d at 859 (further quotation omitted; emphasis added). Because the state appellate court did not apply *Jackson*'s "rational fact finder standard," *Hooker*, 293 F.3d at 1240, we do not afford that court's decision any deference. *See also Jackson*, 443 U.S. at 320 (holding that reviewing only for any relevant supporting

evidence is inadequate to insure due process by requiring criminal convictions to be proved by evidence beyond reasonable doubt).

The State's theory was that Slaughter had purposefully shot Wuertz in the neck to paralyze her, but not render her unconscious. Then, in an effort to punish Wuertz further for commencing the paternity proceedings against him, Slaughter forced her to watch helplessly as he shot their daughter to death. Slaughter now asserts, however, that the evidence at trial does not support a determination that Wuertz remained conscious after the initial attack. We disagree.

The evidence indicated that Wuertz suffered a blow to her lip, which the State theorized occurred at the outset of the killer's attack. However, the medical examiner, Dr. Choi, testified that this blow to Wuertz's lip "probably" did not render her unconscious. Wuertz then suffered two gunshot wounds, one behind her left ear, near the back of her head, at about the hairline, and a head wound inflicted at her left ear lobe. The shot to the neck fractured the cervical spine at C-2 and would have paralyzed Wuertz's arms, legs and torso, but would not necessarily have rendered her unconscious. The other shot to the head, however, would have been the fatal shot and might have resulted in immediate unconsciousness. Before she died, Wuertz also suffered a stab wound to the heart which contributed to, but would not have immediately caused, her death. This stab wound also would not alone have rendered Wuertz immediately unconscious.

The other knife wounds occurred perimortem, that is, just prior to the time of death, after there had been a drop in blood pressure and after Wuertz was very near death and likely unconscious.

Dr. Choi believed the paralyzing gunshot wound to Wuertz's neck occurred before the fatal shot to the head or the knife wounds, based upon the directional flow of the dried blood on Wuertz's face, forward and to the right, which paralleled the angle of the neck wound; the difficulty inflicting a wound with this angle if Wuertz had already been lying on the ground; the angle of the subsequent stab wounds, which indicated Wuertz may have been lying on the ground when the killer inflicted them; and the fact that Wuertz did not suffer any defensive wounds, indicating an incapacitating injury occurred at the attack's outset.

Although Dr. Choi could not say whether or not the gunshot wound to the neck would have rendered Wuertz immediately unconscious, the State's crime scene reconstructionist, Tom Bevel, testified this shot "would not [have] lower[ed] her blood pressure," Trial tr., Aug. 31, 1994, at 50, and thus would not have produced unconsciousness. According to Bevel, it was the second shot that would have lowered Wuertz's blood pressure. In addition, according to Dennis Hull, who was in jail with Slaughter for a brief period of time, Slaughter told him Slaughter had shot Wuertz in the spinal cord to paralyze her.

This evidence is sufficient to permit, though not compel, a reasonable factfinder's inference that Wuertz, conscious but paralyzed, suffered extreme mental anguish at Slaughter's hands. *See Hooker*, 293 F.3d at 1243 n.11; *Romano*, 239 F.3d at 1176, 1177; s*ee also McCracken v. Gibson*, 268 F.3d 970, 982 (10th Cir. 2001), *cert. denied*, 123 S. Ct. 165 (2002). Habeas relief, therefore, is not warranted. *See Hooker*, 293 F.3d at 1243 n.11; *Romano*, 239 F.3d at 1177.

Slaughter further argues, however, that Wuertz did not suffer a sufficient length of time to establish extreme mental cruelty. [4] Oklahoma case law is not always consistent concerning the length of time a victim must consciously endure extreme mental cruelty sufficient to support this aggravating factor. *See, e.g., Turrentine v. State*, 965 P.2d 955, 976 (Okla. Crim. App. 1998) (noting some Oklahoma cases indicate that "[t]he length of time which the victim suffers mental anguish is irrelevant," while other cases require that "the victim is terrorized for a significant period of time before death") (further quotation omitted). Nonetheless, it is clear that under Oklahoma law making a parent watch

---

[4]   To the extent Slaughter is also asserting that Oklahoma is applying this aggravating factor in an unconstitutionally vague and overbroad manner, he never raised that particular claim in federal district court. We, therefore, decline to address that issue here. *See, e.g, Hooker*, 293 F.3d at 1241 n.7 ("Typically, this court does not consider issues that were not first presented to the federal district court.").

as his or her child is murdered will suffice. *Cf. id.* at 976 (holding there was sufficient evidence to support finding that defendant had inflicted extreme mental anguish upon his girlfriend when defendant told his girlfriend that he was going to kill her and her children before doing so); *Smith v. State*, 932 P.2d 521, 535 (Okla. Crim. App. 1996) (holding "evidence that [children] witnessed the stabbing [death] of their mother supports a finding of extreme mental cruelty").

For these reasons, we, therefore, AFFIRM the district court's decision denying Slaughter federal habeas relief.

Entered for the Court


Michael R. Murphy
Circuit Judge